1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10
11

ALLISON BARTON and JANA
MORENO, individually and on behalf of
others similarly situated,

Case No. 3:24-CV-01332-GPC-SBC

12

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS**

13

Plaintiffs,

14

v.

**[ECF No. 15]**

15
16

THE PROCTER & GAMBLE
COMPANY, a Delaware company,

17

Defendant.

18
19

Plaintiffs brought several consumer protection claims against Defendant for

20

allegedly misleading consumers about the presence of lead in Defendant's tampon

21

products.

22

Before the Court is Defendant's motion to dismiss the complaint. ECF No. 15.

23

Plaintiffs filed an opposition, and Defendant filed a reply. ECF Nos. 20, 21. Based on

24

the reasons below, the Court GRANTS in part and DENIES in part Defendant's motion

25

to dismiss.

26
27
28

24-CV-01332-GPC-SBC

# BACKGROUND

Plaintiffs Allison Barton and Jana Moreno (collectively, "Plaintiffs") have sued Defendant The Procter & Gamble Company ("Defendant") for allegedly violating California consumer protection law regarding its Tampax Pearl tampons and Tampax Radiant tampons (collectively the "Products").  ECF No. 10, First Amended Complaint ("Complaint" or "FAC") ¶¶ 1, 118, 121.  Plaintiffs allege that Defendant failed to disclose, and materially omitted, that these Products contain lead.  FAC ¶ 1.

## A. Lead in tampons

According to Plaintiffs, the World Health Organization states that "[t]here is no level of exposure to lead that is known to be without harmful effects" and that "[e]xposure to lead "can affect multiple body systems and is particularly harmful to young children and women of child-bearing age."  FAC ¶¶ 7, 34.  Citing to an article published in a scientific toxicology journal, Plaintiffs allege that lead can lead to "severe health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death."  *Id*. ¶ 25.

The Complaint states that California's Proposition 65 establishes a Maximum Allowable Dose Level ("MADL") of 0.5 micrograms of lead per day for reproductive toxicity.  *Id*. ¶ 35.   Based on "independent scientific testing and analysis of the Products," the ordinary and expected use of the Products would allegedly expose consumers to more than this MADL per day.  *Id*. ¶ 3.  Specifically, Plaintiffs allege that their independent laboratory testing shows that Tampax Pearl Products contain .181 micrograms of lead per gram, and that Tampax Radiant Products contain .123 micrograms of lead per gram.  *Id*. ¶¶ 36, 37.  The testing was done on the super versions of these two Product lines.  *Id*. at ¶ 36 n.13, ¶ 37, n.14.  Products are sold in varying sizes, with different gram weights, and Plaintiffs have extrapolated the testing results from the super Products to the light and regular Products.  *See id*.  Plaintiffs allege that,

based on the daily average use of tampons, consumers are exposed to lead in excess of the MADL, regardless of what size Product they use. *Id*. ¶¶ 38, 39; *see id*.¶¶ 45-82 (detailing how typical use of each Product, regardless of size, would expose consumers to a level of lead that exceeds the MADL).

Plaintiffs allege that this exposure to lead is "particularly detrimental" because the Products are "inserted vaginally where the lead can be directly absorbed into the blood stream." *Id*. ¶¶ 26-33 (detailing how toxins can enter the blood stream directly through vaginal administration).

**B. Alleged misrepresentations and omissions**

According to Plaintiffs, the Products contain the following prominent messaging ("Representations") on their boxes: (i) "#1 U.S. GYNECOLOGIST RECOMMENDED TAMPON BRAND"; (ii) "FREE OF PERFUME"; (iii) "FREE OF ELEMENTAL CHLORINE BLEACHING"; (iv) "TAMPON FREE OF DYES"; and (v) "CLINICALLY TESTED GENTLE TO SKIN." *Id*. ¶ 112.

Plaintiffs allege that these Representations mislead reasonable consumers to believe that the Products are safe to use, including that "they are free from potentially harmful elements and ingredients." *Id*. ¶ 113. According to Plaintiffs, a reasonable consumer could believe, based on these Representations, that the Products would be free from lead. *Id*. ¶¶ 18-20.

Plaintiffs allege that these Representations and the failure to disclose the presence of lead in Defendant's Products constitute a violation of California consumer protection law. *Id*. ¶ 92. Plaintiffs assert that Defendant knew, or should have known, that the Products contained lead and either willfully or intentionally failed to disclose this fact to consumers. *Id*. ¶ 101. Plaintiffs also assert that Defendant owed consumers a duty of care to adequately test its Products for heavy metals and if found, to remediate or disclose their presence. *Id*. ¶ 102.

**C. Plaintiffs' injury and causes of action**

Plaintiff Barton bought Tampax Pearl products in light, regular, and super sizes on numerous occasions. *Id.* ¶ 130. Plaintiff Moreno bought Tampax Radiant products in the regular size on numerous occasions. *Id.* ¶ 146. They purchased these Products without knowing that the Products contained lead, but would not have bought them if they had known of the true contents. *Id.* ¶¶ 21, 109, 130, 146. They had relied on the Representations in believing the Products to be free from harmful effects and safe to use. *Id.* ¶¶ 137, 152. Since consumers were "deprived of making the informed choice between the Products and other menstrual products [that do not contain lead]," Plaintiffs allege that they and other consumers have suffered economic injury based on the purchase price of the Products. *Id.* ¶¶ 107, 108.

Plaintiffs continue to suffer harm because they cannot rely on the labeling of the Products and are unable to determine whether to buy them in the future, even though they would like to purchase them if they do not contain lead. *Id.* ¶¶ 143, 158. Unless Defendant is enjoined from failing to disclose the presence of lead in the future, Plaintiffs will not be able to determine if there is lead or not in the Products. *Id.* ¶¶ 144, 159. Thus, Plaintiffs allege that the legal remedies are inadequate to prevent future injuries. *Id.* ¶¶ 145, 160.

Plaintiffs seek to represent a Class against Defendant for violations of state consumer protection law: (1) Unfair Competition Law ("UCL"), California Business & Professions Code sections 17200 *et seq.*; (2) False Advertising Law ("FAL"), California Business & Professions Code sections 17500 *et seq.*; and (3) Consumers Legal Remedies Act ("CLRA"), California Civil Code sections 1750 *et seq*. *Id.* at 22-28.

Defendant moves to dismiss the complaint on various grounds. ECF No. 15 ("Mot."). For the reasons below, the Court GRANTS in part and DENIES in part this motion to dismiss.

**LEGAL STANDARDS**

**A. Federal Rule of Civil Procedure 12(b)(6)**

Rule 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.  *See Balistreri v. Pacifica Police Dep't*., 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean Witter Reynolds, Inc*., 749 F.2d 530, 534 (9th Cir. 1984).  To survive a motion to dismiss, the complaint must contain a "short and plain statement showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), backed by sufficient facts that make the claim "plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  Rather, it requires enough factual content for the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

In reviewing the plausibility of a complaint, courts must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But courts do not accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Ultimately, the court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

**B. Federal Rule of Civil Procedure 9(b)**

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires a plaintiff bringing such a claim to

5

"state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The circumstances required by Rule 9(b) are the "who, what, when, where, and how" of the fraudulent activity. *Cafasso v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1055 (9th Cir. 2011). In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Id*. The purpose of Rule 9(b) is to require that allegations be "specific enough to give defendants notice of the particular misconduct which is alleged ... so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

**C. Leave to amend**

When a court dismisses a complaint, it "should grant leave to amend... unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). The court considers factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,] and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." *Intri-Plex Techs. v. Crest Group, Inc*., 499 F.3d 1048, 1056 (9th Cir. 2007).

**DISCUSSION**

**A. Judicial notice**

Generally, on a motion to dismiss, courts will limit their review to the contents of the complaint and may only consider extrinsic evidence that is properly presented as part of the complaint. *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001). However, under the incorporation-by-reference doctrine, courts can consider documents

that were not attached to a pleading.  *See Davis v. HSBC Bank Nev., N.A.,* 691 F.3d 1152, 1160 (9th Cir. 2012) (citation omitted).  And under Federal Rule of Evidence 201, a district court may take notice of facts not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).

Defendant seeks incorporation-by-reference or judicial notice of four exhibits: a copy of the article cited in paragraph 25, footnote 4 of the Complaint (Ex. 1); a copy of the article cited in paragraph 27, footnote 5 of the Complaint (Ex. 2); a copy of the announcement published by the U.S. Food & Drug Administration ("FDA") regarding the agency's investigation of lead in tampons (Ex. 3); and a copy of information regarding the MADL for Ethyl Dipropylthiocarbamate published by the California Office of Environmental Health Hazard Assessment (Ex. 4).  ECF No. 16 (Request for Judicial Notice) at 2-4.

The Court incorporates by reference Exhibits 1 and 2 because they are relevant to the instant case, neither party questions their authenticity, and Plaintiffs' Complaint references and relies on these articles to support its allegations.  *See* FAC ¶¶ 25, 27.

The Court takes judicial notice of Exhibit 3 because it is a webpage published by the government that is relevant to the issues at hand, and neither party disputes its authenticity.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).  But the Court will not take judicial notice of the truth of any disputed facts contained in this exhibit.  *See Lee*, 250 F.3d at 689.

As to Exhibit 4, the toxicity of ethyl dipropylthiocarbamate is not at issue in the case and Defendant has not demonstrated that its MADL is relevant.  The Court therefore does not judicially notice this document.  *See Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (9th Cir. 1998) (judicial notice inappropriate where facts to be noticed are irrelevant to disposition of issues before the court).

24-CV-01332-GPC-SBC

1    Defendant submitted a Notice of Supplemental Authority with two exhibits
2    attached: the FDA's announcement on December 23, 2024 that it had completed the
3    literature review portion of its investigation into tampons (Exhibit A) and the actual
4    report containing the literature review (Exhibit B).  ECF No. 28.  The Court takes judicial
5    notice of the Notice of Supplemental Authority, Exhibits A and B because both are
6    "made publicly available by government entities" and "neither party disputes the
7    authenticity of the web sites or the accuracy of the information displayed therein."
8    *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).

9    **B. Primary jurisdiction**

10    In June 2024, researchers published a study which found "measurable
11   concentrations" of lead "in 30 tampons produced by 14 tampon brand manufacturers.
12   Request for Judicial Notice, Ex. 2 at 2, Environmental International 190 (2024) 108849,
13   Tampons as a source of exposure to metal(loids)s, Jenni A. Shearson, et al.  The study's
14   conclusion observed that "[f]uture research is necessary to replicate our findings and
15   determine whether metals can leach out of tampons and cross the vaginal epithelium into
16   systemic circulation."  *Id*. at 9.  In response, on September 10, 2024, the FDA announced
17   that it commissioned an independent literature review and initiated an internal bench
18   laboratory study to determine if metals from tampons are released and if they are
19   absorbed by the body.  Request for Judicial Notice, Ex. 3, Biocompatibility and
20   Toxicology Program: Research on Medical Devices, Biocompatibility, and Toxicology.
21   The study will, among other things, measure the amount of metals that come out of
22   tampons under conditions that more closely mimic normal use.

23    On December 23, 2024, the FDA announced that it had completed the literature
24   review portion of its investigation and that "the findings did not identify safety concerns
25   associated with tampon use and contaminant exposure."  Notice of Supplemental
26   Authority, Exhibit A, at 1.  Despite the "limitations related to the methods used in the

27
28

24-CV-01332-GPC-SBC

[reviewed] studies" and the fact that none of the studies actually addressed "how much, if any, of the contaminants identified are released from the tampon or absorbed through the vagina," the FDA stated that it "continues to recommend FDA-cleared tampons as a safe option for use as a menstrual product." *Id.*

Based upon the completed literature review and the pending laboratory study, Defendant, under the doctrine of primary jurisdiction, moves the Court to dismiss the Complaint or, in the alternative, stay the proceedings, in order to permit the FDA to complete its risk assessment study and report their findings. ECF No. 16 at 14-15.

The doctrine of primary jurisdiction applies in a "limited set of circumstances." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). It allows courts, in their discretion, to stay proceedings, or dismiss a complaint without prejudice, until the "resolution of an issue within the special competence of an administrative agency." *Id.* The policy behind the doctrine is prudential: it applies if the court determines that "an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Id.*

Courts, in determining whether to invoke the doctrine, look at "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002). Courts "must also consider whether invoking primary jurisdiction would needlessly delay the resolution of claims" because in the Ninth Circuit, "efficiency is the deciding factor in whether to invoke primary jurisdiction." *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 760 (9th Cir. 2015).

24-CV-01332-GPC-SBC

In particular, at the motion to dismiss stage, courts must "apply a standard derived from Rule 12(b)(6) jurisprudence: whether the complaint plausibly asserts a claim that would *not* implicate the [primary jurisdiction] doctrine." *Cnty. of Santa Clara v. Astra U.S.*, 588 F.3d 1237, 1251–52 (9th Cir. 2009), *rev'd on other grounds*, 563 U.S. 110 (not invoking primary jurisdiction where, without the agency's expertise, the court could plausibly adjudicate the action) (emphasis in original).

Defendant argues that because the FDA is "actively investigating" the concern at the heart of the lawsuit (i.e., what health risks, if any, exist from the potential presence of heavy metals like lead in tampons), the doctrine of primary jurisdiction applies. *See* Mot. at 6.

It is true that the FDA regulates tampons as Class II medical devices. *See* 21 C.F.R. §§ 884.5460, 884.5470. And mere months after Plaintiffs filed their Complaint, the FDA indicated that it was "aware of concerns about tampon safety after a 2024 study found metals in tampons during laboratory testing." Request for Judicial Notice, Ex. 3. The FDA emphasized that this June 2024 study "did not test whether metals are released from tampons when used" and did not test for metals being "absorbed into the vaginal lining." *Id.* The FDA later completed its literature review of nine published studies and announced that its laboratory study was underway to determine if tampons release the metals they contain and whether these metals are vaginally absorbed. Notice of Supplemental Authority, Exhibit A. Based on all this, Defendant argues that the Court should invoke the doctrine of primary jurisdiction.

Ultimately, in considering primary jurisdiction, the Court focuses on the specific issues raised by the claims. Although the FDA has a history of regulating tampons, the primary jurisdiction doctrine does not "require[ ] that all claims within an agency's purview... be decided by the agency." *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002). In exercising its discretion, the Court considers

24-CV-01332-GPC-SBC

whether the issues raised in the instant case line up with the expertise of the FDA and their ability to resolve the issues before the Court.  Here, Plaintiffs are proceeding on two theories.  First, they claim that Defendant made misrepresentations in the Product's packaging and that a reasonable consumer would be deceived by those misrepresentations.  Second, Plaintiffs are asserting a fraudulent omission theory that requires a showing of an unreasonable safety hazard.

As to the misrepresentation theory, Plaintiffs argue that Products and their Representations are *misleading*, which is "not a technical area in which the FDA [has] greater technical expertise than the courts." *Lockwood v. Conagra Foods, Inc*., 597 F. Supp. 2d 1028, 1035 (N.D. Cal. 2009); *see Jones v. ConAgra Foods, Inc.*, 912 F. Supp. 2d 889, 899 (N.D. Cal. 2012) ("allegations of deceptive labeling do not require the expertise of the FDA to be resolved in the courts, as every day courts decide whether conduct is misleading").  The FDA's literature review did not, and the FDA's laboratory study will not, review affirmative representations such as those on the Product packaging and determine whether they were misleading when Defendant omitted the presence of lead in the tampons. This issue "do[es] not clearly require the FDA's expertise or benefit from uniformity in administration." *Sciortino v. Pepsico, Inc.,* 108 F. Supp. 3d 780, 814 (N.D. Cal. 2015).  As such, the FDA decision will not resolve the issue raised in the misrepresentation claim and primary jurisdiction does not apply to it. *See In re Trader Joe's Co. Dark Chocolate Litig*., 2024 WL 1319725, at *15 (S.D. Cal. Mar. 27, 2024) ("[c]ases concerning dark chocolate bar labeling may be on the rise of late, but cases challenging food product labels are not an issue of first impression").

As to the unreasonable safety risk that makes up part of the fraudulent omission claim, the July 2024 study observes that "no previous studies have measured metals in tampons," Request for Judicial Notice, Ex. 2 at 1.  While there is no question that vaginal walls are permeable and permit direct access to networks of blood vessels, it is currently

unknown whether the lead in tampons leeches out of the product and enters the circulatory system.  The questions of whether lead is released from tampons, enters a woman's circulatory system and creates an unreasonable safety risk are issues of "first impression."  These issues are within the jurisdiction of the FDA and would benefit from the FDA's expertise in determining the safety of consumer products.

However, there is no indication that the FDA will provide an opinion as to an unreasonable safety risk created by any particular tampon, let alone for Defendant's Product.  In addition, Defendant does not address the delay that would likely result if this case were stayed until the FDA issued guidance.  The FDA only stated that it would publicly communicate its laboratory findings after peer review; it gave no indication or timeline of when that would be.  *See* Request for Judicial Notice, Ex. 3.  "[P]rimary jurisdiction is not required when a referral to the agency would significantly postpone a ruling that a court is otherwise competent to make."  *Astiana*, 783 F.3d at 761.  Waiting for this guidance may simply delay Plaintiffs' claims with no actual pay-off in the end.  *See In re Plum Baby Food Litig.*, 2022 WL 16640802, at *1 (N.D. Cal. Jan. 12, 2022) ("[U]ncertainty over how and when the FDA will act counsels against an indefinite stay.")  Finally, given that there is no basis to stay the misrepresentation claim, it would be inefficient for the Court to sever the safety issues related to the fraudulent omission claim, and, as stated earlier, "efficiency is the deciding factor in whether to invoke primary jurisdiction."  *Astiana*, 783 F.3d at 760.

Accordingly, the Court declines to apply the doctrine of primary jurisdiction to either theory of liability.  Defendant's motion to dismiss Plaintiffs' claims on this basis is denied.

### C. Sufficient pleading under Fed. R. Civ. P. 9(b)

Because Plaintiffs' claims "sound in fraud," they must satisfy the heightened pleading requirements of Rule 9(b).  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th

24-CV-01332-GPC-SBC

Cir. 2009).  The Ninth Circuit has held that a claim is "grounded in fraud" for the purposes of Rule 9(b) where "the plaintiff [ ] allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim.".  *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).  A plaintiff must allege with particularity the "who, what, when, where, and how" of the misconduct charged, so that defendants have notice and can defend against the particular misconduct.  *See Kearns,* 567 F.3d at 1124.  The complaint must also state "what is false or misleading about a statement, and why it is false."  *In re GlenFed, Inc. Sec. Litig*., 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc*), superseded by statute on other grounds*, Private Sec. Litig. Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1).

Here, Plaintiffs' FAC claims rely entirely on the same course of alleged fraudulent conduct: Defendant's misrepresentations that their products are safe when they contain lead in such quantities that create an unreasonable safety hazard.  Accordingly, Plaintiffs' claims are subject to Rule 9(b)'s heightened pleading requirement.  *See, e.g., Loh v. Future Motion, Inc*., No. 21-cv-06088-EJD, 2022 WL 2668380, at *5 (N.D. Cal. July 11, 2022) ("each claim is subject to the requirements of Rule 9(b)," including claims for CLRA and unjust enrichment).

Defendant argues that "there are no details about *how many* products were tested, *how* the products were tested, *who* conducted the testing, or *when* the tests occurred." Mot. at 11.  Defendant also asserts that the Complaint does not allege with specificity *why* Plaintiffs believe that the products they purchased contained lead.  Mot. at 9. In other words, "how" and "why" the representations are false.

Plaintiffs allege that they bought specific Products produced by the Defendant, at a specific time and stores, labeled with specific Representations, and that they believed the Products to be lead-free when they were not.  However, Plaintiffs are also required to address "what is false or misleading about [the] statement, and why it is false." *In re*

*GlenFed*, 42 F.3d at 1548.  As to the "what," Plaintiffs adequately allege that the packaging representations communicate to the consumer that the product is free of ingredients that are harmful, which is false because the tampons contain lead.  But, as to "why" and "how" the statement is false, this question does implicate the testing performed because the misrepresentations can only be false if there are facts supporting the presence of lead in the Products purchased by the Plaintiffs.  Defendant argues that these testing allegations fail to provide the details regarding the method of testing and why testing results of a single type of tampon (super) can be extrapolated to the entirety of the Pearl and Radiant line.  Mot. at 18.

Here, Plaintiff Barton alleges she purchased Tampax Pearl Products during the class period in the following sizes: light, regular and super.  FAC ¶ 130.  Plaintiff Moreno alleges she purchased Tampax Radiant Products during the class period in the regular size.  FAC ¶ 146.  In their Complaint, Plaintiffs rely on unidentified independent testing which produced reported results for the super Tampax Pearl and super Tampax Radiant products.  FAC ¶ 36, n. 13, ¶ 37, n.14.  The testing fails to analyze the light and regular Pearl and Radiant Products purchased and, instead, Plaintiffs rely on extrapolation from the super-size Products without any explanation as to why extrapolation is appropriate.  The lack of testing of the light and regular sized Products and the failure to provide support for extrapolation is made more salient given that the Complaint also alleges that Tampax pure cotton tampons were tested and contained such a small amount of lead (if any) that the lead is below the limit of detection.  FAC ¶¶ 83-85.

While a plaintiff is not required to prove the merits of their case at the pleading stage, *see OSU Student Alliance v. Ray*, 699 F.3d 1053, 1077 (9th Cir. 2012) ("plaintiff's failure to prove the case on the pleadings does not warrant dismissal"), more than a conclusory claim that the product contains a harmful substance is required, *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("allegations in a complaint or counterclaim may not

24-CV-01332-GPC-SBC

simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice").  To plausibly allege a presence of harmful substance claim, Plaintiffs are required to allege facts that testing disclosed presence of such substances in the accused product purchased.  *See Lowe v. Edgewell Pers. Care Co*., 711 F. Supp. 3d 1097 (N.D. Cal. 2024); *Krystofiak v. BellRing Brands, Inc*., 2024 WL 3012801, at \*7 (N.D. Cal. June 14, 2024); *Hamman v. Cava Grp., Inc*., No. 22-CV-593-MMA (MSB), 2023 WL 3450654, at \*5 (S.D. Cal. Feb. 8, 2023) (allegations relied on Consumer Reports article, similar studies and reports, and Plaintiff's own tests that the Products are likely to contain PFAS).  Extrapolation of test results can be applied broadly where supported by factual allegations.  *Cf. Onaka v. Shiseido Americas Corp*., 2023 WL 2663877, at \*5 (S.D.N.Y. March 28, 2023).

The Court concludes that the FAC allegations as to the presence of lead fail to provide sufficient detail regarding the testing.  The FAC merely alleges that independent laboratory testing and analysis detected .181 mcg of lead per gram of Product for Tampax Pearl Products and .123 mcg of lead per gram of Product for Tampax Radiant Products.  The FAC provides no further information as to the laboratory that performed the testing or the form and date of testing.  Further, to the extent that Plaintiffs have failed to test the light and regular Products purchased by the Plaintiffs, Plaintiffs are required to either test these Products or explain why extrapolation of the super Pearl and Radiant results is appropriate.

For the foregoing reasons, Plaintiffs' claims fail to meet the heightened pleading standard of Rule 9(b).  Because the deficiencies are ones that Plaintiffs can correct, the Court GRANTS the motion to dismiss without prejudice and provides leave to amend the Complaint.

### D. Proposition 65

1    Defendant argues that the Complaint should be dismissed as an impermissible

2    attempt to bring a "back-door Proposition 65 claim."  Mot. at 11.  Under Proposition 65,

3    no person doing business shall "knowingly and intentionally expose any individual to a

4    chemical known to the state to cause cancer or reproductive toxicity without first giving

5    clear and reasonable warning to such individual" where the amount exceeds the "no

6    significant risk level" established by the California Environmental Protection Agency's

7    Office of Environmental Health Hazard Assessment.  *Sciortino*, 108 F. Supp. 3d at 787

8    (citing Cal. Health & Saf. Code § 25249.6).

9    Private parties may sue to enforce Proposition 65, but the plaintiff must first wait

10   60 days after she gives "notice of an alleged violation" to the "alleged violator," the

11   California Attorney General, and local prosecutors.  Cal. Health & Saf. Code §

12   25249.7(d).  Pursuant to an amendment that took effect in 2002, the notice must also

13   include a "certificate of merit" that states that the "person executing the certificate has

14   consulted with one or more persons with relevant and appropriate experience or

15   expertise… and that, based on that information, the person executing the certificate

16   believes there is a reasonable and meritorious case for the private action."  *See Sciortino*,

17   108 F. Supp. 3d at 788 (citing *DiPirro v. Am. Isuzu Motors, Inc*., 119 Cal. App. 4th 966,

18   970 (Cal. Ct. App. 2004); Cal. Health & Saf. Code § 25249.7(d)(1)).

19   The policy behind these pre-suit requirements is to encourage public enforcement

20   and settlement, and to deter frivolous private lawsuits.  *See Sciortino*, 108 F. Supp. 3d at

21   788 (detailing the policy justifications behind Proposition 65's pre-suit requirements).  To

22   that end, California courts strictly enforce the notice requirements and hold that pre-filing

23   notice is mandatory, and that defective notice cannot be cured retroactively.  *Id*.

24   (discussing *DiPirro* and *In re Vaccine Cases*, 134 Cal. App. 4th 438 (Cal Ct. App.

25   2005)).  The courts in *DiPirro and In re Vaccine Cases* dismissed the complaints with

26   prejudice because allowing retroactive cure "would reduce the effectiveness of

27

28

16

prelitigation efforts by the Attorney General to discourage filing the frivolous suit in the first place." *Id*. (citation omitted).

These pre-suit requirements apply not only to actions explicitly brought under Proposition 65, but to "camouflaged suits" that enforce Proposition 65's strictures under other laws. *Rodriguez v. Equal Exchange, Inc*., 2024 WL 1421971, at *2 (S.D. Cal. Mar. 31, 2024). In other words, a plaintiff cannot skirt these requirements by bringing claims – under consumer protection statutes – that would otherwise "be barred under Proposition 65." *Harris v. RJ Reynolds*, 2016 WL 6246415, at *2 (N.D. Cal Sept. 30, 2016) The key question for the Court then becomes whether the claims asserted in the Complaint are "entirely derivative of an unspoken Proposition 65 violation, or whether they assert claims independent of Proposition 65." *Id*. (citing *Sciortino*, 108 F.Supp. 3d at 792).

Here, the claims in the Complaint are *not* entirely derivative of the unspoken Proposition 65 violation (failure-to-warn of lead). Plaintiffs <u>do</u> rest on Proposition 65 as a basis for wrongdoing that gives rise to their UCL claim. *See* FAC ¶ 98 ("Although Plaintiffs do not bring claims pursuant to Proposition 65, Defendant's violation of Proposition 65 provides a predicate basis for violation of California's Unfair Competition Law…"). However, Plaintiffs do not merely allege that there was a failure to warn under Proposition 65. Instead, they allege that Defendant "has gone beyond the offenses of omission that Proposition 65 seeks to prevent and has affirmatively deceived its customers." *Equal Exchange*, 2024 WL 1421971 at *4. Plaintiffs assert that Defendant has actively misled consumers by making Representations on Products that belie the presence of lead. Since this goes beyond a failure-to-warn violation under Proposition 65, the Court finds that the Plaintiffs assert claims independent of Proposition 65 and are not subject to the notice requirements.

*Sciortino* is instructive. There, the two named plaintiffs asserted claims under the CLRA, UCL, and FAL. Plaintiff Ibusuki alleged that the defendant Pepsi failed to warn

24-CV-01332-GPC-SBC

consumers that its product had a Proposition 65-listed chemical.  The court found that his claims rose "exclusively from his allegations that Pepsi did not issue the warning required by Proposition 65," and dismissed his claims.  *Sciortino*, 108 F.Supp. 3d at 794.  By contrast, the court found that plaintiff Hall's complaint was "based not literally upon a violation of Proposition 65, but on Pepsi's public statements which allegedly misrepresented its actions."  *Id*.  It was not fatal that the Hall complaint referred to Proposition 65 "repeatedly in support of [Hall's] claims," including "as part of her allegations for the predicate wrong in support of her state law claims."  *Id*. at 793-94 (citations to complaint omitted).  Instead, the court found that "[w]hile the alleged misstatement is *related* to Proposition 65, the alleged wrong is not a failure to warn under Proposition 65, but rather a *separate* misrepresentation to consumers…"  *Id*. (emphasis added).

Likewise, the alleged wrong here is not simply a failure-to-warn of lead, but a misrepresentation of the Products, given the statements "FREE OF PERFUME," "FREE OF DYES," "FREE OF ELEMENTAL CHLORINE BLEACHING," and "CLINICALLY TESTED GENTLE ON SKIN."  According to Plaintiffs, "The Representations lead reasonable consumers to believe that the Products are safe to use… The Representations are misleading based on the lead contained in the Products."  FAC ¶¶ 113, 114.  Because "[a]llegations of misleading statements and affirmative misrepresentations fall outside Proposition 65's ambit," Plaintiffs may proceed with their consumer protection claims, notwithstanding the Proposition 65 notice requirements.  *Equal Exchange*, 2024 WL 1421971 at *4 (internal quotations omitted).

**E. UCL, FAL and CLRA**

Assuming Plaintiffs' FAC satisfies Rule 9(b), the Court will further analyze Plaintiffs' UCL, FAL, and CLRA claims based on Defendant's alleged fraudulent omissions and misrepresentations.  The UCL prohibits business practices that are

24-CV-01332-GPC-SBC

"unlawful, unfair or fraudulent," Cal. Bus. & Prof. § 17200; the FAL prohibits the dissemination of any advertising "which is untrue or misleading," Cal. Bus. & Prof. Code § 17500; and the CLRA proscribes specific acts and practices in the sale of goods or services to be unlawful, including making affirmative misrepresentations or omissions regarding the "standard, quality or grade" of a particular good or service, Cal. Civ. Code § 1770(a).

Here, Plaintiffs' UCL, FAL and CLRA claims are premised on a theory of misrepresentation that the Representations on the labels of the Products mislead consumers to believe that the tampons are free of any "potentially harmful elements," including lead, FAC ¶¶ 113, 114, and a material omission theory, alleging that Defendant failed to inform consumers that the tampons contain lead.  FAC ¶¶ 139, 154.

### 1. Actionable misrepresentation

To plausibly allege a UCL, FAL or CLRA claim based upon misrepresentation, Plaintiffs "must allege that they relied on a misrepresentation and suffered injury as a result." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1092 (1993).  Claims under these statutes are governed by the "reasonable consumer" standard, which means that plaintiffs must "show that members of the public are likely to be deceived" by the defendant's marketing claims.  *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 777 (9th Cir. 2024) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)).  These claims can be false, *or* true but "either actually misleading… or has a capacity, likelihood, or tendency to deceive or confuse the public."  *Salazar v. Walmart, Inc.*, 83 Cal. App. 5th 561, 566 (Cal. Ct. App. 2022).  This "reasonable consumer" standard requires "more than a mere possibility" that a defendant's statements "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner."  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (citing *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 508 (Cal. Ct. App. 2003).  Instead, the standard requires a probability "that a significant

24-CV-01332-GPC-SBC

portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* (citation omitted). The standard is "evaluated from the perspective of 'the ordinary consumer'…who is not typically 'exceptionally acute [or] sophisticated'…" *Souter v. Edgewell Pers. Care Co*., 2023 WL 5011747, at *1 (9th Cir. Aug. 7, 2023). Product labels should not be "read in the abstract," *Andrade-Heymsfield v. NextFoods, Inc*., No. 21-cv-1446-BTM-MSB, 2023 WL 2576770, at *3 (S.D. Cal. Mar. 20, 2023), but in the context of the entire packaging messaging.

Here, Plaintiffs have alleged that Defendant's Representations are likely to mislead reasonable consumers. Specifically, Plaintiffs challenge the following statements, *see* FAC ¶¶ 111-112: (i) "#1 GYNECOLOGIST RECOMMENDED TAMPON BRAND; (ii) "FREE OF PERFUME"; (iii) "FREE OF ELEMENTAL CHLORINE BLEACHING"; (iv) "TAMPON FREE OF DYES"; and (v) "CLINICALLY TESTED GENTLE TO SKIN." Plaintiffs allege that these Representations mislead reasonable consumers who could take those statements to mean that the Products are free from potentially harmful elements and ingredients, including lead. FAC ¶¶ 113, 114.

The Court finds that the reasonable consumer could be misled into believing that the Products are free of lead based on the Representations. In this case, representations like "GYNECOLOGIST RECOMMENDED," "FREE OF ELEMENTAL CHLORINE BLEACHING," and "CLINICALLY TESTED GENTLE TO SKIN" are much more conceptually related to the idea that the Products are free from harmful substances, like lead. *See Sebastian v. Kimberly-Clark Corp*., No. 17-cv-442-WQH-JMA, 2017 WL 6497675, at *5 (S.D. Cal. Dec. 18, 2017) ("[T]he statements 'simple formula' and 'gentle' are not mere puffery in the context of litigation about alleged misrepresentations regarding the ingredients in baby wipes."); *Trader Joe's*, 2024 WL 1319725, at *1, 8 (defendant's statements about the quality of the products, like "quality ingredients" and "colors derived only from naturally available products," could mislead a reasonable

consumer to think that there would be no heavy metals in the products).  In *Equal Exchange*, the court rejected plaintiff's allegation that certain statements on defendant's chocolate products, including "always small farmer grown," would lead consumers to believe that the "Products do not contain unsafe levels of toxins."  2024 WL 1421971, at *5.  While the connection between being locally grown and being free from toxins is attenuated, the connection here between the Representations and the suggestion of the absence of lead is stronger.  *See also Barnes v. Nat. Organics, Inc*., 2022 WL 4283779, at *6-7 (C.D. Cal. Sept. 13, 2022) (statements like "safe and natural dietary means" were actionable misrepresentations on the presence of heavy metals).  The Court here agrees that a reasonable consumer could be misled into thinking there is no lead in the Products, based on the Representations about the Products' quality, health, and the absence of certain additives.

Whether a business practice is deceptive is usually a question of fact that is not appropriate for determination at the pleadings stage, so "in federal courts, dismissals of UCL, FAL, and CLRA claims at the pleadings stage have 'occasionally been upheld,' but such cases are 'rare.'"  *Whiteside*, 108 F.4th, 778 (quoting *Williams*, 552 F.3d at 939).  Thus, keeping in mind "the factual inquiry required to adequately assess the merits of the reasonable consumer standard," the Court denies Defendant's motion to dismiss Plaintiffs' claims based on affirmative misrepresentations.  *Chase*, 2018 WL 786743, at *5.

### 2.  Material omission

To support an omission theory, Plaintiffs must establish that Defendant had a duty to disclose that the tampons allegedly contain lead.  There are at least two different tests to determine whether a defendant has a duty to disclose.  *See Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1085 (N.D. Cal. July 18, 2022).   Under one test, the defendant only has a duty when either (1) the defect relates to an unreasonable safety

hazard, or (2) the defect is material, "central to the product's function," and the plaintiff alleges one of the four *LiMandri* factors.[1]  *Id.*  Under another approach, "the defendant has a duty any time that a plaintiff alleges one of the following: (1) the defect relates to an unreasonable safety hazard; (2) the defect is material and related to the product's central function; or (3) the presence of one of the four *LiMandri* factors."  *Id.* (citation omitted).  Because the Ninth Circuit and a majority of district courts have applied the first approach, *id.*, this Court will do the same: Plaintiffs must allege that the defect relates to an unreasonable safety hazard; or that the defect is material, it is central to the product's function, and at least one *LiMandri* factor is present.

In addition to the Rule 9(b) deficiencies regarding the lab testing outlined above, Plaintiffs have not sufficiently alleged that the presence of lead amounts to an unreasonable safety hazard.  As Defendant points out, there is no allegation that the tampons even release lead, and the June 2024 study that Plaintiffs rely on cautions that future research is needed to "determine whether metals can leach out of tampons and cross the vaginal epithelium into systemic circulation."  Request for Judicial Notice, Ex. 2 at 9.  Additionally, the FDA announced in December 2024 that its literature review "did not identify safety concerns associated with tampon use and contaminant exposure."  Notice of Supplemental Authority, Exhibit A, at 1.  Although none of the studies actually addressed "how much, if any, of the contaminants identified are released from the tampon or absorbed through the vagina," the FDA stated that it "continues to recommend FDA-cleared tampons as a safe option for use as a menstrual product."  *Id.*  In turn,

---

[1] The LiMandri factors are: (1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes partial representations while also suppressing some material facts. *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (Cal. Ct. App. 1997).

Plaintiffs allege, without other evidence, that lead will be released from the tampons and will "directly enter the bloodstream."  FAC ¶ 11; *see id.* ¶ 33.  However, this contradicts the June 2024 study Plaintiffs cite, and the Court "is not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."  *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1096 (9th Cir. 2004).

Furthermore, even if the tampons released lead at the levels that Plaintiffs have alleged that they do, Plaintiffs still fail to allege that the lead is "unreasonably hazardous at the particular levels in the specific Products."  *Trader Joe's*, 2024 WL 1319725, at *11; *Rodriguez v. Mondelez Glob. LLC*, 703 F. Supp. 3d 1191, 1210 (S.D. Cal. 2023), *reconsideration denied*, No. 23-CV-00057-DMS-AHG, 2024 WL 1361892 (S.D. Cal. Mar. 29, 2024) (motion to dismiss fraud-by-omission claims granted because Plaintiffs did not plausibly allege defendant concealed an *unreasonable* safety hazard).  In other words, while Plaintiffs detail the harms posed by lead to human health in general and at the Proposition 65 lead thresholds that trigger notice requirements, the FAC fails to sufficiently allege that these potential harms are "unreasonably hazardous" at the particular levels here.  *Trader Joe's*, 2024 WL 1319725, at *11.

Even under the second approach to determine whether a defendant has a duty to disclose, Plaintiffs cannot succeed.  They must sufficiently allege the materiality of the defect, its centrality to the product's function, and the presence of at least one *LiMandri* factor.  While Plaintiffs allege the existence of *LiMandri* factors, *see* Opposition at 18-19, they do not allege facts for the other prongs.  The Court therefore determines that Plaintiffs have not established a duty to disclose upon which their omission theory can stand.

The Court thereby dismisses without prejudice Plaintiffs' UCL, FAL, and CLRA omissions claims, and grants Plaintiffs leave to amend.

**F. Equitable claims**

24-CV-01332-GPC-SBC

1     1.  *Sonner*

2          Plaintiffs seek restitution and injunctive relief under the UCL, FAC ¶ 175;

3     restitution, disgorgement, and injunctive relief under the FAL, FAC ¶ 202; and damages

4     and injunctive relief under the CLRA, FAC ¶¶ 223, 224.  Defendant moves to dismiss the

5     equitable claims under the UCL, FAL, and the CLRA, arguing that Plaintiffs have not

6     alleged an inadequate remedy at law, based on *Sonner v. Premier Nutrition Corp.*, 971

7     F.3d 834 (9th Cir. 2020).  Mot. at 20.  Plaintiffs oppose, arguing that they can plead

8     equitable relief in the alternative, citing to several post-*Sonner* district court cases.  *See*

9     Opposition at 23.

10          In *Sonner*, the Ninth Circuit held that "traditional principles governing equitable

11     remedies in federal courts, including the requisite inadequacy of legal remedies, apply

12     when a party requests restitution under the UCL and CLRA in a diversity action."  971

13     F.3d at 844.  There, the consumer conceded that she sought "the same sum in equitable

14     restitution as 'a full refund of the purchase price'—$32,000,00—as she requested in

15     damages to compensate her for the same past harm." *Id.*  Accordingly, the court held that

16     a plaintiff must allege that she "lacks an adequate remedy at law before securing

17     equitable restitution for past harm under the UCL and CLRA."  *Id.*; *see*, *O'Shea v.*

18     *Littleton*, 414 U.S. 488, 502 (1974) (dismissing complaint that failed to establish the

19     basic requisites for the issuance of equitable relief).

20          District courts have held that this requirement to plead "inadequacy-of-law"

21     applies to equitable relief beyond restitution, including for injunctive relief claims.  *Shay*

22     *v. Apple Inc.*, 2021 WL 1733385, at *3 (S.D. Cal. May 3, 2021) (collecting cases).

23     District courts, however, are far less in agreement on *Sonner*'s application to the pleading

24     stage.  There is currently an "intra-circuit split" on whether courts may allow UCL claims

25     to proceed past pleading when other adequate remedies exist and on how "exacting of a

26     standard *Sonner* imposes on plaintiffs who plead claims for equitable and legal claims at

27

28

the pleading stage." *Jeong v. Nexo Fin. LLC*, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) (citing *Byton N. Am. Co. v. Breitfeld*, 2020 WL 3802700, at *9 (C.D. Cal. Apr. 28, 2020)).

A number of district courts have concluded that *Sonner* does not preclude a plaintiff, at this stage, from pleading equitable remedies in the alternative. *See Nacarino v. Chobani, LLC*, 668 F. Supp. 3d 881, 895-97 (N.D. Cal. 2022) (denying dismissal of restitution claim, even if it "may be revisited at a later stage"); *accord Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 2022 WL 844152 (N.D. Cal. Mar. 22, 2022). Because *Sonner* was decided at a later posture, it does not directly address what exactly a plaintiff must allege at the pleading stage. *See also Carroll v. Myriad Genetics, Inc.*, 2022 WL 16860013, at *6 (N.D. Cal., Nov. 9, 2022) ("This Court will not deprive plaintiffs of their claims without clearer direction from a higher court."). Allowing claims to move forward would also be consistent with Federal Rule of Civil Procedure 8, which allows for pleading in the alternative. Fed. R. Civ. P. 8(a)(3) (a claim for relief must contain "a demand for relief sought, which may include relief in the alternative or different types of relief"); *see also Byton*, 2020 WL 3802700, at *9 ("[T]he Ninth Circuit's general rule is that plaintiffs may plead alternative claims, even if those claims are inconsistent.").

That being said, Plaintiffs here plead <u>no</u> allegations that the legal remedies are inadequate for the restitution or disgorgement that they seek under the UCL and FAL. This warrants dismissal of those claims to the extent they seek restitution and/or disgorgement. *See Scheibe v. Performance Enhancing Supplements, LLC*, 2024 WL 5444644, at *5 (S.D. Cal. Aug. 23, 2023) (allowing CLRA damages claim to move forward while dismissing CLRA equitable relief claim because the complaint lacked any mention of inadequate legal remedies).

At a minimum, Plaintiffs must plead inadequate legal remedies in the operative pleading to allege claims for equitable relief under the UCL, FAL, and CLRA. They

have shown this for the injunctive relief that they seek.  *See* FAC ¶¶ 142-45, 157-60.  But because Plaintiffs have not alleged that legal remedies are inadequate for the disgorgement and restitution remedies under the UCL and FAL, the Court grants the Defendant's motion to dismiss the UCL and FAL claims to the extent they seek these forms of relief.  The Court grants Plaintiffs leave to amend the complaint to expressly allege facts to support a claim that their remedies at law are inadequate.

2.  <u>Standing for injunctive relief</u>

The Ninth Circuit in *Davidson v. Kimberly-Clark*, 889 F.3d 956 (9th Cir. 2018), held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm."  *Davidson,* 889 F.3d at 969 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  "Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future."  *Id.*  If plaintiffs can establish that they will be unable to rely on the product's advertising or labeling in the future, so will not purchase the product even if they want to; or that they might purchase the product in the future, because they may reasonably but incorrectly assume the product has changed, then plaintiffs can establish a future injury.  *See id*. at 969-70.

Defendant argues that Plaintiffs still do not have standing for their injunctive relief claims because this Court and others in the Circuit have held that courts "cannot impose a mandatory injunction requiring a company to alter its products."  Mot. at 23-24 (quoting *Renn v. Otay Lakes Brewery, LLC*, 2024 WL 331616, at *8 (S.D. Cal. Jan. 29, 2024)).  Defendant interprets the Plaintiffs' statement that they would "like to purchase the Products in the future if the Products do not contain lead," to mean that Plaintiffs are

(only) asking for an injunction that would force Defendant to change its Products to not contain lead.  Mot. at 23.

However, if the Court is construing the complaint in the light most favorable to the Plaintiffs, it is clear that the FAC gives rise to multiple "tenable injunctive remedies." Opposition at 25.  Plaintiffs certainly will not buy the Products if they contain lead, but the key point – and the thing that constitutes the injury for standing – is that Plaintiffs *won't know* if the Products contain lead or not without an injunction of some kind.  *See* FAC ¶¶ 144, 159.  Plaintiffs allege that they are not "able to rely on the labeling and advertising of the products for their truth, and thus [are] unable to determine whether [they] can purchase the Products in the future," even though they would like to purchase them.  *Id*. ¶¶ 143, 158; *see Davidson*, 889 F.3d at 971-72 (plaintiffs face injury when they are "unable to rely on [Defendant's] representation of its products in deciding whether or not [they] should purchase the product in the future").  Several forms of injunctive relief could redress this injury.  In the Complaint itself, the form of injunctive relief most directly alluded to is "enjoin[ing] [Defendant] from failing to disclose the presence of lead"; in other words, enjoining Defendant to disclose, on its advertising or labeling of their Products, whether there is lead or not.  FAC ¶¶ 144, 159.  Plaintiffs do not seek – or do not *only* seek – an injunction that would mandate Defendant to change the content of their Products.

Plaintiffs' allegation that they will have no idea of determining whether the Products contain lead or not constitutes a "threatened injury certainly impending," and thereby establishes standing for their injunctive relief claims.  *See Davidson*, 889 F.3d at 972.

## CONCLUSION

Based on the reasoning above, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss.  The Court GRANTS Plaintiffs leave to amend and DIRECTS Plaintiffs to file a second amended complaint within 25 days of this order.

**IT IS SO ORDERED.**

Dated:  February 13, 2025

Hon. Gonzalo P. Curiel
United States District Judge

24-CV-01332-GPC-SBC